*Admiral Ins. Co. v. Niagara Transformer Corp.*

# United States Court of Appeals
## For the Second Circuit

August Term 2021

Argued:  May 3, 2022
Decided:  January 6, 2023

No. 21-2733

ADMIRAL INSURANCE COMPANY,

*Plaintiff-Appellant*,

*v.*

NIAGARA TRANSFORMER CORPORATION,

*Defendant-Appellee*.*

Appeal from the United States District Court
for the Southern District of New York
No. 20-cv-4041, Andrew L. Carter, Jr., *Judge*.

Before:        CALABRESI, CABRANES, and SULLIVAN, *Circuit Judges*.

In this declaratory-judgment action, Admiral Insurance Co. ("Admiral") seeks a declaration that it need not defend or indemnify its historical insured, Niagara Transformer Corp. ("Niagara"), in potential litigation between Niagara and nonparties Monsanto Co., Pharmacia LLC, and Solutia Inc. (collectively, "Monsanto") over harms caused by polychlorinated biphenyls that Monsanto had sold to Niagara in the 1960s and 1970s.  Admiral now appeals from the order of the district court (Carter, *J.*) dismissing its action for lack of a justiciable "case of

_____

* The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

actual controversy" within the meaning of the Declaratory Judgment Act (the "DJA"), 28 U.S.C. § 2201(a). In reaching this jurisdictional ruling, the district court principally relied on (1) the fact that Monsanto has not commenced or explicitly threatened formal litigation against Niagara, and (2) its assessment that Monsanto would not be likely to prevail in such litigation.

While the district court properly concluded that it lacked jurisdiction to declare Admiral's duty to *indemnify* Niagara, it did not adequately distinguish between that duty (which is triggered by a determination of the insured's liability to the third party) and the insurer's separate duty to *defend* its insured (which is triggered by the third party's filing suit against the insured). Because a declaratory-judgment action concerning either duty becomes justiciable upon a "practical likelihood" that the duty will be triggered, *see, e.g.*, *Associated Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 35 (2d Cir. 1992), the justiciability of Admiral's duty-to-defend claim turns on the practical likelihood that Monsanto *will* file suit against Niagara – not on whether Monsanto has already in fact done so or explicitly threatened to do so. As a result, we **AFFIRM** the district court's order dismissing Admiral's action to the extent that it sought a declaration of Admiral's duty to indemnify Niagara, and **REMAND**, pursuant to our practice under *United States v. Jacobson*, 15 F.3d 19 (2d Cir. 1994), for the district court to determine – as relevant to its jurisdiction to declare Admiral's duty to defend Niagara – whether there exists a practical likelihood that Monsanto will file suit against Niagara. Consistent with that practice, appellate jurisdiction will be restored to this panel after the district court has supplemented the record and reconsidered its prior decision on remand.

Should the district court determine on remand that it has jurisdiction to declare Admiral's duty to defend Niagara, it may nevertheless decline to exercise such jurisdiction. To that end, we clarify the standard governing a district court's discretion to decline jurisdiction under the DJA. We previously held in *Continental Casualty Co. v. Coastal Savings Bank*, 977 F.2d 734 (2d Cir. 1992), and *Broadview Chemical Corp. v. Loctite Corp.*, 417 F.2d 998 (2d Cir. 1969) – that a district court *must* exercise jurisdiction if the issuance of a declaratory judgment would serve a useful purpose in settling the legal relations in issue or afford relief from the uncertainty giving rise to the proceeding. But our caselaw following *Wilton v. Seven Falls Co.*,

2

515 U.S. 277 (1995), has treated the factors established by *Broadview* as only two among other factors that district courts should balance in determining whether to exercise jurisdiction under the DJA. Our caselaw suggests, and we now clarify, that district courts have discretion to decline jurisdiction upon the application of an open-ended, multi-factor balancing test in which no one factor necessarily mandates the exercise of jurisdiction.

AFFIRMED IN PART AND REMANDED IN PART.

> JUSTIN N. KINNEY (Michael S. Chuven, *on the brief*), Kinney Lisovicz Reilly & Wolff PC, New York, NY, *for Plaintiff-Appellant* Admiral Insurance Company.
>
> RODMAN E. HONECKER, Windels Marx Lane & Mittendorf, LLP, New York, NY, *for Defendant-Appellee* Niagara Transformer Corporation.

RICHARD J. SULLIVAN, *Circuit Judge*:

In this declaratory-judgment action, Admiral Insurance Co. ("Admiral") sought a declaration that it need not defend or indemnify its historical insured, Niagara Transformer Corp. ("Niagara"), in potential litigation between Niagara and nonparties Monsanto Co., Pharmacia LLC, and Solutia Inc. (collectively, "Monsanto") over harms caused by polychlorinated biphenyls ("PCBs") that Monsanto had sold to Niagara in the 1960s and 1970s. Admiral now appeals from the order of the district court (Carter, *J.*) dismissing its action for lack of a justiciable "case of actual controversy" within the meaning of the Declaratory

3

Judgment Act (the "DJA"), 28 U.S.C. § 2201(a). In reaching this jurisdictional ruling, the district court relied principally on (1) the fact that Monsanto has not commenced or explicitly threatened formal litigation against Niagara, and (2) its assessment that Monsanto would not be likely to prevail in such litigation.

While the district court properly concluded that it lacked jurisdiction to declare Admiral's duty to *indemnify* Niagara, it did not adequately distinguish between that duty (which is triggered by a determination of the insured's liability to the third party) and the insurer's separate duty to *defend* its insured (which is triggered by the third party's filing suit against the insured). Because a declaratory-judgment action concerning either duty becomes justiciable upon a "practical likelihood" that the duty will be triggered, *see, e.g.*, *Associated Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 35 (2d Cir. 1992), the justiciability of Admiral's duty-to-defend claim turns on the practical likelihood that Monsanto *will* file suit against Niagara – not on whether Monsanto has already in fact done so or explicitly threatened to do so. As a result, we **AFFIRM** the district court's order dismissing Admiral's action to the extent that it sought a declaration of Admiral's duty to indemnify Niagara, and **REMAND**, pursuant to our practice under *United States v. Jacobson*, 15 F.3d 19 (2d Cir. 1994), for the district court to

4

determine – as relevant to its jurisdiction to declare Admiral's duty to defend Niagara – whether there exists a practical likelihood that Monsanto will file suit against Niagara. Consistent with that practice, appellate jurisdiction will be restored to this panel after the district court has supplemented the record and reconsidered its prior decision on remand.

Should the district court determine on remand that it has jurisdiction to declare Admiral's duty to defend Niagara, it may nevertheless decline to exercise such jurisdiction. To that end, we clarify the standard governing a district court's discretion to decline jurisdiction under the DJA. We previously held in *Continental Casualty Co. v. Coastal Savings Bank*, 977 F.2d 734 (2d Cir. 1992), and *Broadview Chemical Corp. v. Loctite Corp.*, 417 F.2d 998 (2d Cir. 1969), that a district court *must* exercise jurisdiction if the issuance of a declaratory judgment would serve a useful purpose in settling the legal relations in issue or afford relief from the uncertainty giving rise to the proceeding. But our caselaw following *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995), has treated the factors established by *Broadview* as only two among other factors that district courts should balance in determining whether to exercise jurisdiction under the DJA. Our caselaw suggests, and we now clarify, that district courts have discretion to decline jurisdiction upon the application of

an open-ended, multi-factor balancing test in which no one factor necessarily mandates the exercise of jurisdiction.

## I. BACKGROUND

Defendant-Appellee Niagara is a manufacturer of electrical transformers and the historical insured of Plaintiff-Appellant Admiral. Throughout the 1960s and 1970s, Niagara purchased PCBs from nonparty Monsanto for use in its transformers. PCBs are highly toxic and carcinogenic chemical compounds, the manufacture, processing, and distribution of which are now largely banned under federal statute. *See* 15 U.S.C. § 2605(e)(2)(A), (3)(A); *see also* 40 C.F.R. § 761.20 (imposing strict regulations on the storage, handling, and disposal of PCBs and PCB waste materials). Monsanto's sales of PCBs to Niagara were made pursuant to a "Special Undertaking" agreement, which provided that Niagara would "defend, indemnify, and hold harmless Monsanto . . . from and against any and all liabilities, claims, damages, [etc.] arising out of . . . the . . . use, sale[,] or disposition of such PCB[]s by, through[,] or under [Niagara]." J. App'x at 19. Monsanto also required Niagara to maintain "adequate insurance protection." *Id.* at 17. In keeping with this agreement, Niagara purchased a general liability policy from Admiral that ran from 1976 to 1977.

Beginning in 2009, various individuals, businesses, municipalities, and states commenced actions against Monsanto in state and federal courts across the country, asserting claims for personal injuries, environmental clean-up costs, property damage, and other harms allegedly caused by exposure to or contamination by PCBs originally manufactured by Monsanto. In August 2016, after losing an eight-figure judgment in one such case (and while countless other such cases were in active litigation or settlement negotiations, with still more being filed anew), Monsanto sent Niagara a letter, through counsel, "demand[ing]" that Niagara "defend, indemnify[,]and hold harmless" Monsanto "in connection with all current and future PCB-related litigation wherein . . . Monsanto is, or will be, named as a defendant, and for the amount of any resulting judgments (if any) and settlements, to the full extent required by the Special Undertaking." *Id.* at 22. Monsanto further stated that "Niagara . . . *will be held liable* for the amount of the resulting settlements or judgments (if any) [in the PCB-related actions against Monsanto,] as well as the incurred costs, expert witness fees, attorney's fees, and all other reasonable expense incurred in defending [such] actions." *Id.* (emphasis added). Appended to this letter was a chart enumerating forty-six relevant cases pending against Monsanto. Niagara responded with a letter from its own counsel,

7

denying any and all liability to Monsanto. To date, Monsanto has not commenced formal legal action against Niagara.

In early 2020, Niagara learned that Magnetek, Inc. – another industrial manufacturer that had sourced PCBs from Monsanto pursuant to a contract substantially identical to the Special Undertaking – had been sued by Monsanto but was able to obtain coverage from its historical insurance carrier. This prompted Niagara to further investigate and to ultimately identify Admiral as its own historical liability insurance carrier from the 1970s. Thus, in March 2020, Niagara gave Admiral notice of Monsanto's underlying demands and tendered its own "demand[]" that Admiral "defend and indemnify Niagara . . . in connection with any and all claims made by Monsanto." *Id.* at 35. One month later, Admiral denied coverage for reasons including Niagara's putative failure to timely notify Admiral of Monsanto's underlying demands.[1]

Shortly thereafter, in May 2020, Admiral filed its complaint in district court, seeking a declaration that it has no obligation to defend or indemnify Niagara in connection with the claims asserted in or arising out of Monsanto's 2016 demand

---

[1] Additionally, in June 2020, Niagara discovered through media reports of Bayer AG settlements of certain PCB-related litigation that sought recovery from Monsanto. Niagara was not involved in the settlement discussions, and neither Bayer nor Monsanto sought indemnification from Niagara for the settlement.

letter. On September 1, 2020, Niagara moved to dismiss the complaint for lack of subject-matter jurisdiction, arguing principally that Admiral's action did not present a justiciable "case of actual controversy" under the DJA. 28 U.S.C. § 2201(a). The same day, Admiral cross-moved for summary judgment. On September 29, 2021, the district court issued an opinion and order granting Niagara's motion to dismiss and thus declining to reach the merits of Admiral's cross-motion for summary judgment. The district court concluded that there was no "case or controversy" under the DJA because there was no "practical likelihood" that "Niagara will incur liability . . . to Monsanto in connection with the PCB-related litigation." Sp. App'x at 9–10. For support, the district court noted, among other things, that (1) "to date, Monsanto ha[d] filed no lawsuit against Niagara" and "never explicitly threatened to sue Niagara," and (2) "questions over the validity, scope, and enforceability of the Special Undertaking" remain. *Id.* at 5, 10.

Admiral timely appealed.

## II. STANDARD OF REVIEW

On appeal from a dismissal for lack of subject-matter jurisdiction, we review the district court's legal conclusions de novo, *Amidax Trading Grp. v. S.W.I.F.T.*

9

*SCRL*, 671 F.3d 140, 145 (2d Cir. 2011), and its factual findings for clear error, *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 249 (2d Cir. 2000). In so doing, "we draw all facts – which we assume to be true unless contradicted by more specific allegations or documentary evidence – from the complaint and from the exhibits attached thereto," and "we construe all reasonable inferences . . . in [the non-movant's] favor." *Amidax Trading Grp.*, 671 F.3d at 145.

### III.  DISCUSSION

### A.  Justiciability

#### 1.  Applicable Law

Article III of the Constitution limits the "judicial Power of the United States" to "Cases" and "Controversies." U.S. Const. art. III, §§ 1–2; *see Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) ("[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to *actual* cases or controversies." (emphasis added; citation omitted)). As a corollary, federal courts may not "decide abstract questions," *Socialist Lab. Party v. Gilligan*, 406 U.S. 583, 586 (1972), or "give opinions advising what the law would be upon a hypothetical state of facts," *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (internal quotation marks and alteration omitted).

10

The DJA provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, *whether or not further relief is or could be sought*." 28 U.S.C. § 2201(a) (emphasis added). In other words, the DJA "creates a means by which rights and obligations may be adjudicated in cases involving an actual controversy that has not reached the stage at which either party may seek a coercive remedy." *United States v. Doherty*, 786 F.2d 491, 498 (2d Cir. 1986) (citation omitted); *see id.* at 498–99 ("[T]he declaratory[-]judgment procedure enables a party who is . . . threatened . . . in the enjoyment of what he claims to be his rights[] to initiate the proceedings against his tormentor and remove the cloud by an authoritative determination of the plaintiff's legal right . . . and the defendant's absence of right . . . ." (internal quotation marks and alteration omitted)). The Supreme Court has "explained that the phrase 'case of actual controversy' in the [DJA] refers to the [same] type of 'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937)). Thus, the DJA "does not *expand* the subject[-]matter jurisdiction of the federal courts," *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 95 (2d Cir.

11

2011) (emphasis added), *aff'd*, 568 U.S. 85 (2013); rather, the "relevant inquiry for [the DJA's case-of-actual-controversy] prerequisite is *coextensive* with the analysis applicable to the 'case[-]or[-]controversy' standard embodied in Article III," *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 406 (S.D.N.Y. 2002) (emphasis added), *aff'd*, 346 F.3d 357 (2d Cir. 2003).

"The difference between an abstract question and a 'controversy' contemplated by the [DJA] is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy." *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *cf. Socialist Lab. Party*, 406 U.S. at 586 ("It is axiomatic that the federal courts do not decide abstract questions . . . ."). "Basically," however, the critical "question . . . is whether . . . there is a substantial controversy, between parties having adverse legal interests, of *sufficient immediacy and reality* to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127 (quoting *Md. Cas. Co.*, 312 U.S. at 273) (emphasis added); *see also Aetna Life Ins.*, 300 U.S. at 239, 241 (explaining that an "actual controversy" within the meaning of the DJA "must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character"). "That the liability may be contingent does not

12

necessarily defeat jurisdiction of a declaratory[-]judgment action.  Rather, courts

should focus on the *practical likelihood* that the [relevant] contingencies will occur."

*Emps. Ins. of Wausau v. Fox Ent. Grp., Inc.*, 522 F.3d 271, 278 (2d Cir. 2008) (quoting

*E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 177 (2d Cir. 2001)) (emphasis

added; alteration omitted); *see also Associated Indem. Corp. v. Fairchild Indus., Inc.*,

961 F.2d 32, 35 (2d Cir. 1992) (same).  "Indeed, litigation over insurance

coverage" – like the dispute before us here – "has become the paradigm for

asserting jurisdiction despite future contingencies that will determine whether a

controversy ever actually becomes real."  *E.R. Squibb & Sons*, 241 F.3d at 177

(citation omitted).

When applying the practical-likelihood standard in insurance coverage

disputes, we must account for the fact that "an insurer's duty to defend is . . .

distinct from [its] duty to indemnify," *Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*,

754 F.3d 136, 140 (2d Cir. 2014), and that insurance law applies "very different

presumptions to each," *CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*, 720 F.3d 71, 77

(2d Cir. 2013) (internal quotation marks omitted).[2]  Thus, we agree with Judge Cote

---

[2] To be clear, our decisions in *Euchner-USA* and *CGS Industries* drew this distinction in the context of applying New York insurance law in cases where its applicability was undisputed.  *See Euchner-USA*, 754 F.3d at 140 ("The parties agree that New York law controls whether [the

that district courts must "distinguish between the duty to defend and the duty to indemnify in determining whether each issue posed in a declaratory[-]judgment action is ripe for adjudication." *Atl. Cas. Ins. Co. v. Value Waterproofing, Inc.*, 918 F. Supp. 2d 243, 261 (S.D.N.Y.), *aff'd sub nom. Atl. Cas. Ins. Co. v. Greenwich Ins. Co.*, 548 F. App'x 716 (2d Cir. 2013); *accord Columbia Cas. Co. v. Ga. & Fla. RailNet, Inc.*, 542 F.3d 106, 110–11 (5th Cir. 2008); *Lear Corp. v. Johnson Elec. Holdings Ltd.*, 353 F.3d 580, 583 (7th Cir. 2003); *Nationwide Ins. v. Zavalis*, 52 F.3d 689, 693–94 (7th Cir. 1995). Because "the duty to defend is triggered by the filing of a lawsuit while the duty to indemnify is triggered by a determination of liability," a district court's jurisdiction to declare an insurer's duty to defend and its duty to indemnify turn on different inquiries – each involving the practical likelihood that the triggering

insurer] had a duty to defend [a third party's] action [against the insured]. In New York, an insurer's duty to defend is 'exceedingly broad' and distinct from the duty to indemnify." (quoting *Auto. Ins. Co. of Hartford v. Cook*, 7 N.Y.3d 131, 137 (2006))); *CGS Indus.*, 720 F.3d at 76–77 ("The parties agree that New York law governs this action. . . . New York law distinguishes between the duty to indemnify and the duty to defend . . . ."). Here, by contrast, choice of law is a disputed issue: while Admiral contends that New York law governs its dispute with Niagara, Niagara contends that either New Jersey or Missouri law "may apply." Niagara Br. at 22. But for purposes of our analysis on this point, the parties' choice-of-law dispute is of no moment, as both New Jersey and Missouri courts recognize the same distinction between the duty to defend and the duty to indemnify as do New York courts. *See, e.g., Mem'l Props., LLC v. Zurich Am. Ins. Co.*, 210 N.J. 512, 529 (2012) ("The duty to defend and the duty to indemnify are distinct; an insurance company's duty to defend is neither identical [to] nor coextensive with its duty to indemnify." (internal quotation marks omitted)); *Piatt v. Ind. Lumbermen's Mut. Ins. Co.*, 461 S.W.3d 788, 792 (Mo. 2015) (en banc) ("A liability insurer's duties to defend and indemnify are distinct. . . . The duty to defend is broader than the duty to indemnify.").

14

event will occur. *Atl. Cas. Ins. Co.*, 918 F. Supp. 2d at 261 (citing *Columbia Cas. Co.*, 542 F.3d at 110–11). With respect to the duty to defend, the district court must find a practical likelihood that a third party will *commence* litigation against the insured. With respect to the duty to indemnify, the court must find a practical likelihood that the third party will *prevail* in such litigation. Accordingly, a district court "may" well have jurisdiction to "issue a declaratory judgment on [an insurer's] duty to defend," even "while holding that the duty to indemnify is not ripe for adjudication." *Id.*

### 2. Application

Applying these principles here, we find that the district court correctly determined that it lacked jurisdiction to issue a declaratory judgment on Admiral's duty to *indemnify* Niagara, but did not adequately perform the necessary and separate analysis for determining its jurisdiction to declare Admiral's duty to *defend* Niagara.

In the decision below, the district court properly focused its analysis on the "practical likelihood" of Monsanto's taking actions that would resolve "contingencies" embedded in the coverage dispute between Admiral and Niagara. Sp. App'x at 9 (explaining that the justiciability of Admiral's declaratory-judgment action "turns on whether there exists a practical likelihood that [certain]

15

contingencies will occur"). However, the district court's *framing* of the relevant "contingencies" – and its assessment of what it would take for Admiral to establish the requisite "likelihood that th[ose] contingencies will occur," *id.* at 10 – failed to sufficiently account for the "distinct[ion]" between "an insurer's duty to defend" and its "duty to indemnify," *Euchner-USA*, 754 F.3d at 140.

Despite repeated references to multiple "contingencies," the district court only articulated one: "*[t]he* contingency here is whether Niagara *will incur liability* for defense and indemnity to Monsanto in connection with the PCB-related litigation." Sp. App'x at 9 (emphasis added). The district court "conclude[d]" that, "[b]ecause it is unknown whether Monsanto will ever pursue future litigation against Niagara and the validity and scope of the Special Undertaking is also undetermined, future litigation that may *require Admiral to indemnify Niagara* is unlikely." *Id.* at 14 (emphasis added; internal quotation marks and alterations omitted). Accordingly, the district court found that Admiral "has failed to show that there is a practical likelihood that" the relevant "contingencies will occur." *Id.* at 10.[3] Meanwhile, the district court appears not to have assessed the practical likelihood of whether Monsanto *will sue* Niagara – and instead, simply relied on

---

[3] It bears emphasizing that the district court did not state what the other "contingencies" were.

the fact that "[t]o date, Monsanto *has not [already] filed suit* against Niagara" or "explicitly threatened" to do so. *Id.* at 5 (emphasis added).

On the one hand, because "the duty to indemnify is triggered by a determination of liability," *Atl. Cas. Ins*, 918 F. Supp. 2d at 261, the district court's finding that it is practically "unlikely" that "Niagara will incur liability . . . to Monsanto," Sp. App'x at 9, 14, was sufficient to justify its conclusion that it lacked jurisdiction to declare Admiral's duty to indemnify. And we find no clear error in that underlying finding, *see Zappia Middle E. Constr.*, 215 F.3d at 249, given the district court's careful analysis of the "undetermined" status of the "validity and scope of the Special Undertaking" upon which Monsanto's theory of Niagara's liability was premised, Sp. App'x at 14. We therefore affirm the district court's jurisdictional ruling on the duty-to-indemnify component of Admiral's declaratory-judgment action.

On the other hand, because "the duty to defend is triggered by the filing of a lawsuit," *Atl. Cas. Ins.*, 918 F. Supp. 2d at 261, the district court's jurisdiction to declare Admiral's duty to defend Niagara properly turns on the question of whether there exists a "practical likelihood" that Monsanto *will file suit* against Niagara, *Associated Indem.*, 961 F.2d at 35 (citation omitted). That question is

17

distinct, of course, from the questions of whether Monsanto *has already filed suit* or *explicitly threatened to file suit* against Niagara. Thus, the mere fact that "[t]o date, Monsanto has n[either] filed suit against Niagara" nor "explicitly threatened" to do so, Sp. App'x at 5, is insufficient to justify concluding that there is no justiciable "case of actual controversy," 28 U.S.C. § 2201(a), over Admiral's duty to defend Niagara. Rather, the relevant question is whether "the facts alleged, under all the circumstances," evince a practical likelihood that Monsanto will sue Niagara. *MedImmune*, 549 U.S. at 127 (quoting *Md. Cas. Co.*, 312 U.S. at 273).

Although it may be true that "[d]istrict courts in this Circuit generally" *do* "find [that] a practical likelihood exists in insurance declaratory[-]judgment actions where there is a separate, underlying third-party action against the insured" already pending, Sp. App'x at 11, that is a sufficient – rather than necessary – condition for finding jurisdiction to declare an insurer's duty to defend an insured. Indeed, we have explicitly clarified that, in this context, the mere "threat of future litigation remains relevant in determining whether an actual controversy exists." *Nike*, 663 F.3d at 96. And applying that principle, we have routinely exercised subject-matter jurisdiction over insurers' declaratory-judgment actions that were filed – and decided by district courts – before the

18

relevant third party had filed suit against the insured. *See, e.g., Am. Ins. Co. v. Fairchild Indus., Inc.*, 56 F.3d 435, 438–39 (2d Cir. 1995).[4]

We therefore remand, pursuant to our practice under *United States v. Jacobson*, 15 F.3d 19 (2d Cir. 1994), for the district court to "reconsider its prior conclusion" regarding the justiciability of the duty-to-defend component of Admiral's declaratory-judgment action, *Florez v. CIA*, 829 F.3d 178, 189 (2d Cir. 2016). In particular, we instruct the district court on remand to assess the "practical likelihood," *Emps. Ins. of Wausau*, 522 F.3d at 278 (citation omitted), that Monsanto will commence formal litigation against Niagara to vindicate the positions staked out in the 2016 Demand Letter.

---

[4] The district court considered *American Insurance Co.* "inapposite" because "[a]side from the fact that justiciability was not the issue before the court in that case, . . . it was evident that a practical likelihood of liability existed" there. Sp. App'x at 13. With regard to the district court's passing comment that "justiciability was not the issue before the court in that case," we emphasize that because "[a]n appellate federal court" always "must satisfy itself not only of its own [subject-matter] jurisdiction, but also of that of the lower courts in a cause under review," *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934), justiciability is *always* implicitly at issue – even where "neither party has questioned [it]," *Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 740 (1976). *See also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 278 (1977) ("[W]e are obliged to inquire [nostra] sponte *whenever a doubt arises* as to the existence of federal jurisdiction." (emphasis added)). Thus, the very fact that we decided *American Insurance Co.* on the merits, without "inquir[ing] [nostra] sponte" into a potential defect in justiciability, suggests that we found that case to be a justiciable controversy. *Mt. Healthy*, 429 U.S. at 278. And "[w]hile such . . . sub silentio jurisdictional ruling[s]" are not strictly "binding precedent in this [C]ourt," we have recognized their significant instructive value. *Brooks v. Flagg Bros., Inc.*, 553 F.2d 764, 774 (2d Cir. 1977), *rev'd on other grounds*, 436 U.S. 149 (1978).

19

"In the interests of judicial economy and orderly resolution of this matter, we find prudent a limited remand" under *Jacobson* to allow the district court to conduct this inquiry "in the first instance, and to conduct any further fact-finding that may be required" to that end. *Florez*, 829 F.3d at 189 (citation omitted). Once it has done so, the district court may "then return its determination to [this panel] for consideration without the need for a new notice of appeal, briefing schedule, and reassignment to a new panel unfamiliar with the case." *Id.*[5]

## B.      Discretion to Decline Jurisdiction Under the DJA

Of course, should the district court determine on remand that it *has* jurisdiction to declare Admiral's duty to defend Niagara, it may nevertheless decline to *exercise* such jurisdiction. That is because the DJA provides only that federal courts "*may* declare the rights and other legal relations of an[] interested party seeking such declaration" in "a case of actual controversy" – not that they *must* so declare. 28 U.S.C. § 2201(a) (emphasis added). We "have consistently

---

[5] Once the district court has issued its decision on remand, "either party may restore jurisdiction to this panel by filing a letter with the Clerk of this Court" within thirty days after the district court's entry of such order, "set[ting] forth the grounds for claiming error in the [d]istrict [c]ourt's decision and attach[ing] a copy of [its] order." *Florez*, 829 F.3d at 190. "Upon the filing of such a letter, the opposing party may file a response . . . within fourteen days." *Id.* But "[i]f neither party files an initial letter within thirty days of the [district-court] order's entry, appellate jurisdiction will be restored automatically, and an order affirming the [d]istrict [c]ourt will issue immediately." *Id.*

20

interpreted this permissive language as a broad grant of discretion to district courts to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear." *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003). Nevertheless, because there appears to be considerable confusion among the district courts of this Circuit regarding just how broad that discretion really is, we write to clarify the legal standard that governs district courts' discretion to decline to issue declaratory judgments in "case[s] of actual controversy" that are otherwise "within [their] jurisdiction." 28 U.S.C. § 2201(a).

In *Broadview Chemical Corp. v. Loctite Corp.*, we held that "[t]he two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." 417 F.2d 998, 1001 (2d Cir. 1969) (quoting Edwin Borchard, *Declaratory Judgments* 299 (2d ed. 1941)). We further held that "[i]t follows as a general corollary to this rule that if either of these objectives can be achieved[,] the action should be entertained and

21

the failure to do is error." *Id.*[6] We reaffirmed that holding in 1992, when we held

that "a [district] court *must* entertain a declaratory[-]judgment action: (1) when

the judgment will serve a useful purpose in clarifying and settling the legal

relations in issue, or (2) when it will terminate and afford relief from the

uncertainty, insecurity, and controversy giving rise to the proceeding. . . . If *either*

prong is met, the action *must* be entertained." *Cont'l Cas. Co. v. Coastal Sav. Bank*,

977 F.2d 734, 737 (2d Cir. 1992) (citing *Broadview*, 417 F.2d at 1001) (emphasis

added). Under that rigid, mandatory standard, district courts' "discretion" to

decline jurisdiction under the DJA was – for all intents and purposes – discretion

in name only. It is difficult, after all, to imagine a scenario in which the issuance

of a declaratory judgment would *not* "serve a useful purpose in clarifying . . . the

---

[6] We note that *Broadview*'s holding is actually *not* a "general corollary" to the "rule" enunciated by Professor Borchard in *Declaratory Judgments*, the source from which *Broadview* derived its factors. 417 F.2d at 1001. Borchard identified the "useful[-]purpose" factor and the "termination" factor and then stated that "when *neither* of the[] results [contemplated by those factors] can be accomplished, the court should *decline* to render the declaration prayed." Borchard, *supra*, at 299 (emphasis added). It does not follow from that statement that if either the "useful purpose" or "termination" factor is satisfied, then the court *must* render the declaration sought. To conclude as much – as *Broadview* did – is to succumb to the "fallacy of denying the antecedent." *Crouse-Hinds Co. v. InterNorth, Inc.*, 634 F.2d 690, 702 n.20 (2d Cir. 1980) ("The proposition that 'A implies B' is not the equivalent of 'non-A implies non-B,' and neither proposition follows logically from the other. The process of inferring one from the other is known as the 'fallacy of denying the antecedent.'" (citing John Cooley, *A Primer of Formal Logic* 7 (1942))). Thus, according to Borchard, it is entirely possible that either factor could be satisfied, and a district court could still permissibly decline to entertain the action.

legal relations in issue" or "afford relief from the uncertainty . . . giving rise to the proceeding." *Cont'l Cas.*, 977 F.2d at 737.

Shortly after we decided *Continental Casualty*, the Supreme Court handed down a decision casting significant doubt on our cribbed view of the discretion afforded to district courts under the DJA. In *Wilton v. Seven Falls Co.*, the Court repeatedly emphasized "the unique breadth of [district courts'] discretion to decline to enter a declaratory judgment." 515 U.S. 277, 287 (1995); *see also id.* at 279, 282–83, 286–88 (using similar language). Along the way, the Court also rejected arguments that closely mirrored the holdings of *Broadview* and *Continental Casualty*, namely, that "[d]istrict courts *must* hear declaratory judgment cases absent exceptional circumstances," and that "district courts *may* decline [to do so only] if no beneficial purpose is thereby served or if equity otherwise counsels." *Id.* at 287 (emphasis in original; citation omitted).

Candidly, our post-*Wilton* caselaw has been less than a model of clarity in its treatment of the *Broadview/Continental Casualty* factors. In *Dow Jones* (decided six years after *Wilton*), we did not expressly address the mandatory character of the *Broadview* prongs. We did, however, cite *Wilton* for the general proposition that "district courts" have "broad . . . discretion" under the DJA "to refuse to

23

exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear." *Id.* (citing *Wilton*, 515 U.S. at 282–83). And we characterized the *Broadview* factors merely as "factors that this . . . [C]ircuit[] ha[s] developed to *guide the exercise of discretion* in [DJA] cases." *Dow Jones*, 346 F.3d at 359 (emphasis added). Without much analysis, we also noted that the district court in *Dow Jones* had "balanced" the two *Broadview* factors alongside three additional "factors that . . . *other* circuits have developed to guide the exercise of discretion in [DJA] cases," including: "whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata'"; "whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court"; and "whether there is a better or more effective remedy." *Id.* at 359–60 (citing *NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.,* 28 F.3d 572, 577 (7th Cir. 1994); *Grand Trunk R.R. Co. v. Consol. Rail Corp.,* 746 F.2d 323, 326 (6th Cir. 1984)) (emphasis added). We did not specify, however, whether *we* were adopting the "other circuits[']" factors. In the end, we ultimately affirmed the district court's decision to "decline to exercise discretionary jurisdiction over the action," based on its "detailed analysis" of "all" "five . . . factors." *Id.* at 360.

24

In *New York v. Solvent Chemical Co.*, 664 F.3d 22 (2d Cir. 2011), we added to the confusion. There, we stated that "a district court *must* inquire" into *all five* factors laid out in *Dow Jones*. *Id.* at 26 (emphasis added). But this consolidation of factors collapsed *Dow Jones*'s distinction between the *Broadview* factors, comprising "*this Court['s]* . . . test," and those factors that were components of "*[o]ther circuits['] . . .* test[s]." *Dow Jones*, 346 F.3d at 359 (emphasis added).[7]

And then, just a year later, we muddied the waters even further by reverting to *Dow Jones*'s categorization of the five factors – stating that the first two factors (again, the *Broadview* factors) constitute "*our* test" while the next three are merely "additional factors" that "*[o]ther circuits* have added" into *their* tests. *Niagara Mohawk Power Corp. v. Hudson River-Black River Regul. Dist.*, 673 F.3d 84, 105 (2d Cir. 2012) (emphasis added). Thus, for all our tinkering, we have *still* not clearly stated whether the *Broadview/Continental Casualty* factors remain mandatory after *Wilton*.

---

[7] Although we stated in *Solvent Chemical* that "a district court must *inquire*" into all five factors, we did not say that a district court must *entertain* a declaratory-judgment action if any one of those factors was satisfied. 664 F.3d at 26 (emphasis added). Rather, we simply concluded that "in *th[at particular]* case," the combined effect of all "[t]he[] factors" was to "require [the] district court to issue a declaratory judgment." *Id.* (emphasis added).

Not surprisingly, this lack of clear guidance has resulted in a significant split of authority among the district courts of our Circuit. While most have continued to apply the *Broadview*/*Continental Casualty* mandatory standard in strict fashion,[8] many others have treated our post-*Wilton* decisions as abandoning that standard and replacing it with an open-ended, multi-factor balancing test.[9] *See ICBC*

[8] *See, e.g.*, *Paul Rudolph Found. v. Paul Rudolph Heritage Found.*, No. 20-cv-8180 (CM), 2021 WL 4482608, at *9 (S.D.N.Y. Sept. 30, 2021); *Am. Empire Surplus Lines Ins. Co. v. Uplift Elevator of NY Inc.*, No. 20-cv-3246 (PGG), 2021 WL 7709971, at *8 (S.D.N.Y. May 26, 2021); *Roller v. Red Payments L.L.C.*, No. 19-cv-5285 (GRB), 2021 WL 505558, at *5 (E.D.N.Y. Feb. 11, 2021); *Disability Rts. N.Y. v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 18-cv-980 (GTS), 2019 WL 4643814, at *23 (N.D.N.Y. Sept. 24, 2019), *partial reconsideration granted on other grounds*, 2020 WL 6484049 (N.D.N.Y. Nov. 4, 2020); *H&H Env't Sys., Inc. v. Evanston Ins. Co.*, No. 18-cv-06315 (EAW), 2019 WL 1129434, at *5 (W.D.N.Y. Mar. 12, 2019); *Dubov v. Lewis*, No. 18-cv-3854 (PAE), 2019 WL 1060652, at *2 (S.D.N.Y. Mar. 6, 2019); *Trs. of N.Y.C. Dist. Council of Carpenters Pension Fund v. Champion Int'l Constr. Corp.*, No. 18-cv-5881 (JGK), 2018 WL 5635218, at *2 (S.D.N.Y. Oct. 30, 2018); *Am. Time Exch., LLC v. Tissot SA*, No. 17-cv-4737 (VM), 2017 WL 4712634, at *3 (S.D.N.Y. Sept. 27, 2017); *Armstrong Pump, Inc. v. Hartman*, No. 10-cv-446S (HBS), 2017 WL 3971296, at *23 (W.D.N.Y. Sept. 8, 2017); *Intrepidus, LLC v. Bivins*, No. 15-cv-7721 (LTS), 2017 WL 1608896, at *6 (S.D.N.Y. Apr. 28, 2017); *Simoniz USA, Inc. v. Dollar Shave Club, Inc.*, No. 16-cv-688 (VAB), 2016 WL 7197361, at *6 (D. Conn. Dec. 9, 2016); *Ace Arts, LLC v. Sony/ATV Music Pub., LLC*, 56 F. Supp. 3d 436, 446 (S.D.N.Y. 2014); *Precimed Inc. v. ECA Med. Instruments*, No. 13-cv-761 (HBS), 2014 WL 317086, at *8 (W.D.N.Y. Jan. 28, 2014), *adopted in relevant part*, No. 13-cv-761 (RJA), 2014 WL 1883584 (W.D.N.Y. May 12, 2014); *Daebo Int'l Shipping Co. v. Ams. Bulk Transp. Ltd.*, No. 12-cv-7960 (PAE), 2013 WL 2149595, at *3 (S.D.N.Y. May 17, 2013); *Chevron Corp. v. Salazar*, No. 11-cv-691 (LAK), 2011 WL 3628843, at *5 n.35 (S.D.N.Y. Aug. 17, 2011).

[9] *See, e.g.*, *Rapillo v. CitiMortgage, Inc.*, No. 15-cv-5976 (KAM), 2018 WL 1175127, at *6 n.8 (E.D.N.Y. Mar. 5, 2018) ("Subsequent decisions from the Supreme Court and the Second Circuit indicate that the[] two [*Broadview*/*Continental Casualty*] factors are not mandatory."); *McCullough v. World Wrestling Ent., Inc.*, No. 15-cv-1074 (VLB), 2016 WL 3962779, at *16 (D. Conn. July 21, 2016) ("disagree[ing] with" litigant's "argu[ment] that the Second Circuit has never explicitly abrogated its [mandatory] language in *Broadview Chem[ical] Corp* that if either of the first two factors [is] met[,] a district court must not decline to exercise jurisdiction"); *Lafarge Can. Inc. v. Am. Home Assurance Co.*, No. 15-cv-8957 (RA), 2018 WL 1634135, at *9 (S.D.N.Y. Mar. 31, 2018) ("*Continental Casualty Co. . . .* was decided before the Supreme Court gave the district courts 'unique and

*Standard Sec., Inc. v. Luzuriaga*, 217 F. Supp. 3d 733, 738 n.1 (S.D.N.Y. 2016) (discussing other district courts' confusion over whether "*Continental Casualty*'s mandatory standard" – that is, its "test mandating [the exercise of] jurisdiction when either of the two [*Broadview*] factors is met" – remains viable).

Despite their lack of clarity, our post-*Wilton* decisions are best read as having abandoned the mandatory standard we had previously announced in *Broadview* and *Continental Casualty*. None of those decisions has referred to, let alone endorsed, *Broadview*'s or *Continental Casualty*'s language mandating that a district court *must* entertain a declaratory-judgment action if either *Broadview* factor is satisfied. Indeed, while we have occasionally cited *Broadview* and *Continental Casualty* following *Wilton* for the two "factors" or "prongs" that they enumerated, it has been more than thirty years since any of our cases has invoked *Continental Casualty*'s "must be entertained" language, 977 F.2d at 737, or even *Broadview*'s "should be entertained" language, 417 F.2d at 1001. *See Albradco, Inc. v. Bevona*, 982 F.2d 82, 87 (2d Cir. 1992). Meanwhile, all have identified other factors that district courts either may, *see Dow Jones*, 346 F.3d at 359–60; *Niagara*

substantial' DJA discretion in *Wilton* . . . , and the Second Circuit thus applied a standard more stringent [in *Continental Casualty Co.*] than courts do today." (quoting *Wilton*, 515 U.S. at 289–90)); *Ray Legal Consulting Grp. v. Gray*, 37 F. Supp. 3d 689, 700 (S.D.N.Y. 2014) (characterizing the two *Broadview/Continental Casualty* factors merely as ones that "courts should consider").

27

*Mohawk Power*, 673 F.3d at 105, or must, *see Solvent Chem.*, 664 F.3d at 26, consider alongside the two *Broadview* factors – which would hardly make sense unless they were implicitly holding that the *Broadview* factors are no longer dispositive in their own right.  Through it all, our post-*Wilton* cases have consistently emphasized that district courts have "broad . . . discretion . . . to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear."  *Dow Jones*, 346 F.3d at 359; *see also Niagara Mohawk Power*, 673 F.3d at 105, 106 n.7 (similarly referring to district courts' "broad discretion").  And it would hardly constitute meaningful discretion – much less *broad* discretion – to insist that district courts "must" exercise their jurisdiction to issue a declaratory judgment whenever one would "serve a useful purpose in clarifying . . . the legal relations in issue" or "afford relief from the uncertainty . . . giving rise to the proceeding."  *Cont'l Cas.*, 977 F.2d at 737.

Thus, consistent with our post-*Wilton* decisions, we now clarify that even in circumstances "when [a declaratory] judgment [would] serve a useful purpose in clarifying and settling the legal relations in issue" or "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding," *Cont'l Cas.*, 977 F.2d at 737 (citing *Broadview*, 417 F.2d at 1001), district courts retain

28

"broad discretion" to decline jurisdiction under the DJA, *Niagara Mohawk Power*, 673 F.3d at 106 n.7. We further clarify that the following considerations, "to the extent they are relevant" in a particular case, *Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 146 (3d Cir. 2014), should inform a district court's exercise of such discretion: (1) "whether the [declaratory] judgment [sought] will serve a useful purpose in clarifying or settling the legal issues involved"; (2) "whether [such] a judgment would finalize the controversy and offer relief from uncertainty"; (3) "whether the proposed remedy is being used merely for procedural fencing or a race to res judicata"; (4) "whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court"; (5) "whether there is a better or more effective remedy," *Niagara Mohawk Power*, 673 F.3d at 105 (citations omitted); and (6) whether concerns for "judicial efficiency" and "judicial economy" favor declining to exercise jurisdiction, *Reifer*, 751 F.3d at 141, 149 (citation omitted); *see infra* note 10 (collecting additional cases applying this factor).

Inherent in district courts' "broad . . . discretion" to decline jurisdiction under the DJA, *Dow Jones*, 346 F.3d at 359, is a similarly broad discretion to weigh the factors we have enumerated here. Thus, no one factor is sufficient, by itself, to

mandate that a district court exercise – or decline to exercise – its jurisdiction to issue a declaratory judgment. Likewise, "[t]hese factors are non-exhaustive," *Reifer*, 751 F.3d at 146, with district courts retaining wide latitude to address other factors as relevant to the ultimate question of whether "the normal principle that federal courts should adjudicate claims [over which they have] jurisdiction" should "yield[] to considerations of practicality and wise judicial administration" in a particular case, *Wilton*, 515 U.S. at 288.

Nevertheless, district courts' "broad discretion" to weigh these and other relevant factors is not altogether "unfettered." *Niagara Mohawk Power*, 673 F.3d at 105. To the contrary, there are "three principal ways" in which "an abuse of discretion can occur" in this context: (1) "when a relevant factor that should have been given significant weight is not considered"; (2) "when an irrelevant or improper factor is considered and given significant weight"; and (3) "when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment." *Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1330 (11th Cir. 2005) (internal quotation marks omitted); *see also Dow Jones*, 346 F.3d at 359 ("The Supreme Court has . . . made it clear that this

30

broad discretion is reviewed deferentially, for abuse of discretion." (citing *Wilton*,

515 U.S. at 289; *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 494–95 (1942))).

This framework is faithful to the permissive language of the DJA, *see* 28

U.S.C. § 2201(a), and is consistent with *Wilton*'s command to afford district courts

broad deference in declaratory-judgment actions.  It is also in step with the law of

each of our sister circuits.[10]

## IV.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's ruling that it

lacked jurisdiction to declare Admiral's duty to indemnify Niagara; and

---

[10] The Third, Fourth, Fifth, Sixth, Seventh, Eighth, Tenth, Eleventh, Federal, and D.C. Circuits have all held that district courts' discretion to decline jurisdiction under the DJA is "guide[d]" by an open-ended, multi-factor balancing test in which district courts "should meaningfully consider" a variety of factors – no one of which *mandates* the exercise of jurisdiction.  *Reifer*, 751 F.3d at 141 & n.13, 146 & n.22 (emphasis added; citation omitted); *accord Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256–58 (4th Cir. 1996); *Sherwin-Williams Co. v. Holmes County*, 343 F.3d 383, 389–91 (5th Cir. 2003); *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 758–61 (6th Cir. 2014); *Amling v. Harrow Indus. LLC*, 943 F.3d 373, 379–80 (7th Cir. 2019); *Scottsdale Ins. Co. v. Detco Indus., Inc.*, 426 F.3d 994, 996–99 (8th Cir. 2005); *United States v. City of Las Cruces*, 289 F.3d 1170, 1180, 1186–92 (10th Cir. 2002); *Ameritas Variable Life Ins.*, 411 F.3d at 1330–32; *Warsaw Orthopedic, Inc. v. Sasso*, 977 F.3d 1224, 1229–32 (Fed. Cir. 2020); *Morgan Drexen, Inc. v. CFPB*, 785 F.3d 684, 695–98 (D.C. Cir. 2015).  The Ninth Circuit has adopted a substantively similar test, *see Huth v. Hartford Ins. Co. of the Midwest*, 298 F.3d 800, 802–04 (9th Cir. 2002), albeit with the modest qualification that a "[d]istrict [c]ourt cannot decline to entertain [a declaratory-judgment] action as a matter of whim or personal disinclination," *id.* at 803 (citation omitted).  The First Circuit has taken an even *more* broadly permissive view of district courts' discretion under the DJA. *See DeNovellis v. Shalala*, 124 F.3d 298, 313 (1st Cir. 1997) (holding simply that "[district] courts have broad discretion to decline to enter a declaratory judgment," without enumerating specific factors that district courts must consider in exercising such discretion).

**REMAND**, pursuant to our practice under *Jacobson*, *see* 15 F.3d at 22, for the district court to determine (1) whether there is a justiciable "case of actual controversy," 28 U.S.C. § 2201(a), over Admiral's duty to defend Niagara, and (2) if so, whether to exercise its discretion – as guided by the framework clarified above – to decline jurisdiction. Consistent with *Jacobson*, appellate jurisdiction will be restored to this panel after the district court has supplemented the record and reconsidered its prior decision on remand.